

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

PHILLIP CORDELL FIKES, *as the*
*personal representative of the Estate of*
*Phillip David Anderson*,

    Plaintiff,

vs.

RON ABERNATHY, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)

7:16-cv-00843-LSC

## MEMORANDUM OF OPINION

Before the Court are Defendant Tuscaloosa County, Alabama's ("Tuscaloosa" or "the County"), motion for summary judgment (doc. 78), and Defendants', Sheriff Ron Abernathy ("Abernathy"), Chief Eric Bailey ("Bailey"), Sergeant Kenneth Abrams ("Abrams"), and Detention Officer Patrick Collard's ("Collard") (collectively "the law enforcement defendants") motion for summary judgment (doc. 84). Plaintiff Phillip Cordell Fikes ("Fikes" or "Plaintiff") brought this suit as the personal representative of the Estate of Phillip David Anderson ("Anderson" or "decedent"), alleging deliberate indifference to serious medical needs under 42 U.S.C. § 1983 and state law claims for negligence, wantonness, wrongful death, and intentional infliction of emotional distress. For the reasons

stated below, **Tuscaloosa's motion** for summary judgment is due to be granted, and the law enforcement **defendants' motion** for summary judgment is due to be granted in part and denied in part.

## I. BACKGROUND[1]

Anderson was arrested on Saturday, February 7, 2015, based on an outstanding warrant for contempt of court arising out of his failure to appear at a child support hearing in Tuscaloosa County. He was taken to the Tuscaloosa County jail (**"the jail"**), where he remained until February 15, 2015, the day of his death.

During the intake process, Anderson informed jail officials about his health problems and daily medications.[2] Anderson answered in the affirmative when asked whether he had any current illnesses and health problems. On February 9, 2015, **Anderson was seen by Dr. Phillip Bobo ("Dr. Bobo"). The** nursing notes from the visit indicate that Dr. Bobo prescribed naproxen for Anderson. According to

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.,* 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotes omitted).

[2] Anderson listed propananol (for hyperthyroid), albuterol (for COPD) and tromodol (for shoulder pain) as his necessary daily medications.

Plaintiff, Anderson did not receive any of the daily medication he required. Consequently, on Thursday, February 12, 2015, **Anderson's** daughter, Erica Fikes (**"Erica"**), visited the jail attempting to deliver **Anderson's** thyroid medication. Erica testified that the jail officials would not accept the medication because it was only in its original bottle, but not in the original box.

Healthcare for inmates in the jail is conducted by Whatley Health Services, Inc. (**"Whatley"**), a private, non-profit, community health center, pursuant to a contract between Whatley and Tuscaloosa. Whatley in turn contracts with a physician and also nurses to provide care. Tuscaloosa also has a contract with Capstone Health Services Foundation, an Alabama non-profit corporation, to provide psychiatric services to the inmates at the jail. There was a charge of twenty-five dollars ($25.00) for an inmate to see the doctor and obtain medical care at the jail at all times **during Anderson's incarceration.**

**Anderson was housed in cell block 11 ("CB 11") during the entirety of his** time in the Tuscaloosa Jail. Abrams and Collard each served as shift supervisors over the area which included CB11 during a number of shifts within the relevant time frame. The Tuscaloosa County Policy and Procedure Directives (**"The Directives"**) state that **"**detention officers and other personnel are trained to respond to health-related situations within a four minute response time.**"** (Doc. 86-

7 at 23.) The training program that personnel undergo includes instruction in the recognition of signs and symptoms, as well as information concerning required action in potential emergency situations. The Directives contain a provision explaining that while the determination of when to transfer an inmate to an emergency facility and decisions regarding transportation by ambulance are usually made by medical staff, "extenuating circumstances may require the prompt decision by the Shift Supervisor for immediate transport of [an] inmate to the designated emergency facility via EMS." (*Id.*)

According to Fikes, beginning with one of his first meals in jail and continuing throughout his detention, Anderson felt ill and was unable to keep his food down. He was in severe pain throughout his stay at the facility, and spent time prostrate on the floor moaning and holding his stomach, asking for help. On Friday, February 13, 2015, Anderson was administered medication by Tuscaloosa County Jail medical staff for constipation. The following day, Saturday, February 14, 2015, at approximately 8:18 p.m., Detention Officer Jeremiah Van Horn ("Van Horn") notified the Supervisor on duty that Anderson was complaining of stomach pain, shortness of breath, and that he had been unable to hold down food for a number of days. Supervisor Anderson then called Nurse Bridgette Thomas ("Nurse Thomas") who advised that Anderson had been seen and was being treated.

Later that same day, Anderson was taken to the medical clinic by Detention Officer Clay Montgomery ("Montgomery") who told the staff there that Anderson needed to be seen. Upon arrival at the clinic, Anderson was moaning and groaning and holding his stomach stating that he did not feel well. Nurse Thomas and another nurse took Anderson's temperature and blood pressure, and then consulted with Dr. Bobo. The nurses informed Montgomery that the doctor could not see Anderson until the following Monday, February 16th. Anderson continued to moan and groan and proceeded to lie down on a bench in the medical center. The nurses administered a liquid medication that Anderson could not keep down, he vomited for a number of minutes while gagging, moaning and holding his stomach. Montgomery was advised that there was nothing else that could be done until Monday. Anderson then was escorted back to CB 11 all the while holding his stomach and verbalizing that he was in pain.

At approximately 11:00 p.m. on Saturday evening, Supervisor Raymond Anderson, Sergeant Michael Hall and Sergeant Darren Strong responded to CB 11 where they visually observed Anderson lying on his bed moaning, groaning, sweating and holding his stomach. He was unable to speak to the officers when they asked him what was wrong. They proceeded to the medical clinic to notify the medical personnel. The nurses on duty informed the officers that Anderson was

being treated for constipation and he would be put on a liquid diet the following day.

On Sunday, February 15, 2015, at approximately 12:45 a.m., Detention Officers Edward Pierce (**"Pierce"**) and Meagan Franklin (**"Franklin"**) responded to noises coming from CB 11. They observed Anderson lying on the floor between two tables moaning and holding his stomach. Pierce and Franklin notified Nurse Thomas who entered the cellblock and looked at Anderson. She stated that she had already notified her supervisor, Nurse Elizabeth Evers, as well as Dr. Bobo of **Anderson's condition and was instructed by them not to send Anderson to** the hospital. A little while later, at approximately 1:01 a.m., Supervisor Raymond Anderson called Pierce and instructed him to take Anderson to the medical clinic where Nurse Thomas saw Anderson, but did not administer any medication. Anderson was then returned to his cellblock.

Abrams, a deputy sheriff who serves as a Sergeant with the criminal investigation division, and Eric Bailey, a deputy sheriff who serves as the Chief of Jail Operations began their shift as Shift Supervisors at 7 a.m. on Sunday the 15th. Though the details are disputed, at one point during their shift, they checked on Anderson. Multiple inmates had reported that, the evening prior, Anderson had hollered in pain all throughout the night.

At approximately 12:04 p.m., Detention Officer David Cannon ("Cannon") responded to CB 11 due to inmates kicking on the door. Cannon observed Anderson lying on the floor and inmates holding his head, the inmates stated he had passed out on the way to the bathroom. Cannon approached Anderson and asked him what was wrong but, Anderson did not respond. A wheelchair was obtained by Collard at the direction of the nurse. Cannon then called a "code 10-33" which is the code for a medical emergency. Nurse Stephanie Kaiser and Sergeant Abrams arrived in CB 11 and initiated CPR (Cardiopulmonary Resuscitation). The AED (Automated External Defibulator) was also utilized to assist with life-saving measures. Some inmates in CB 11 contacted Anderson's family to inform them of the situation. NorthStar EMS, Inc., responded to the facility and assisted with lifesaving measures and, ultimately transported Anderson to DHC Regional Medical Center's Emergency Room.

Bailey, Chief of Jail Operations, arrived at DCH and spoke with Anderson's family regarding his condition. Shortly after being transported, Anderson was pronounced dead—the cause of death was determined to be a perforated duodenal ulcer. The Tuscaloosa Sheriff's Office conducted an investigation of Anderson's death soon afterwards.

III.   MOTIONS FOR SUMMARY JUDGMENT

A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[3] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015)

---

[3] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015); *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013).

(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

B. **Tuscaloosa's** Summary Judgment Motion

On September 19, 2016, Tuscaloosa filed a motion to dismiss (doc. 31), which was granted in part and denied in part on May 25, 2017. (Doc. 45.) As explained in the Court's Memorandum of Opinion, the only claim remaining

against Tuscaloosa is that it improperly funded healthcare at the Tuscaloosa County Jail via involvement in an allegedly deliberate plan to delay medical treatment in order to lower medical costs—which in turn **caused Anderson's death**. (*See* Doc. 45 at 8 ("**[T]he only liability that Tuscaloosa can incur under §** 1983 is for not appropriating the funds that the sheriff needs for maintenance of the **jail.**"[4] (citing *Turquitt v. Jefferson Cty., Ala.*, 137 F.3d 1285, 1290 (11th Cir. 1998))).

Fikes failed to respond to Tuscaloosa's motion for summary judgment; however, this Court is nonetheless obligated to determine whether Tuscaloosa is entitled to judgment as a matter of law on the undisputed facts.[5] *See Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'rs Participating Emp'rs v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004) (A district court "**cannot base the** entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." (internal quotation marks omitted)). As such, the Court will address the merits of Tuscaloosa's motion.

---

[4] Section 14-6-19 of the Alabama Code provides that:
> [n]ecessary clothing and bedding must be furnished by the sheriff or jailer, at the expense of the county, to those prisoners who are unable to provide for themselves, *and also necessary medicines and medical attention* to those who are sick or injured, when they are unable to provide for themselves.

Ala. Code § 14-6-19 (1975) (emphasis added).

[5] Fikes's failure to respond to Tuscaloosa's motion for summary judgment or to place any evidence before this Court has created a situation in which all of **Tuscaloosa's** evidence is undisputed. While the Court must view the facts in a light most favorable to Fikes, it can be said that there are no genuine issues as to any fact material to **Tuscaloosa's** motion for summary judgment.

Tuscaloosa County is required under Alabama law to provide funds for both the upkeep of the jail and necessary medical care for the inmates held in the jail. Ala. Code § 14-6-19 (1975). At the federal level, the Due Process Clause (for pretrial detainees)[6] and the Eighth Amendment of the U.S. Constitution requires local governments to provide necessary medical care to incarcerated persons. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (**"Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment."**). In order to prevail on a claim against a county under § 1983, a plaintiff must show that **"the constitutional violation occurred** as a result of a county policy[,] . . . the **[county's]** action was taken with the requisite degree of culpability, and . . . a direct causal link [exists] between the **[county's]** action and the deprivation of federal **rights."** *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (quoting *Bd. of Cty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997)). Culpability can be established by showing **deliberate indifference, which requires "(1) subjective** knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is **more than mere negligence."** *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.

---

[6] "Correctional officers are, of course, bound by the Eight Amendment's prohibition against cruel and unusual punishment. Technically, the Fourteenth Amendment Due Process Clause, not the Eight Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [Anderson]. However, the standards under the Fourteenth Amendment are identical to those under the **Eighth.**" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)(internal citations omitted).

1999). The U.S. "Supreme Court has recognized that correctional inmates 'must rely on prison authorities to treat [their] medical needs; if the authorities fail to do so, those needs will not be met.' Federal and state governments therefore have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A county is not absolved of this duty solely by contracting with a private medical provider. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985).

Tuscaloosa proffered the affidavit of Bill Lamb ("Lamb"), the Chief Financial Officer for Tuscaloosa County, who prepares and administers the budgets for all county offices, to show that its funding was more than minimally adequate. He testified that during the fiscal year in which Anderson was incarcerated, the county expended nearly $1.8 Million on medical care at the Tuscaloosa County Jail, on an inmate population averaging less than 600. (*See* Doc. 79-1.) Of that total, $1,383,291.78 was for medical services and $402,617.15 was allocated for drugs and medical supplies. When divided, the sum equals approximately $3,000 per inmate for medical care. Additionally, Lamb testified that "no requests for funding of medical services or supplies were denied during [the] fiscal year, and the County [] never refused to pay any medical bill arising

from the jail." Tuscaloosa's contract for medical services with Whatley provides for routine doctor visits to the jail, and for a doctor to be on call for emergencies. It also provides for around-the-clock nursing services and a clinic within the jail facility which is stocked and equipped by the county. (*See* Doc. 79-4.)

The Court finds the funding amount to be adequate, especially when considered in conjunction with the number of inmates. The Court also finds that Tuscaloosa did not breach its duties to properly fund the jail, or more specifically, to properly fund the medical treatment for those held in the jail, and finds no direct **causal link between Tuscaloosa's policies and Anderson's death**. As such, **Tuscaloosa's motion for** summary judgment[7] (doc. 78) is due to be granted.

### C. Law Enforcement Defendants' Summary Judgment Motion

#### 1. State law Claims (Negligence/Wantonness, Wrongful Death and the Intentional Infliction of Emotional Distress)

In his response in opposition, Plaintiff concedes that Bailey and Abrams are sheriffs or deputy sheriffs under Alabama law and, as such, are immune from the state law claims against them. *See Drain v. Odom*, 631 So. 2d 971, 972 (Ala. 1994)

---

[7] "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may : . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(3).

("deputy sheriffs are immune to the same extent as sheriffs"). Accordingly, summary judgment is due to be granted as to all state law claims against them.

As against the law enforcement defendants, the only state law claims remaining are against Collard, a detention officer. Alabama Code § 14-6-1[8] provides immunity to detention officers who act within the line and scope of their duties and in compliance with the law. Collard was acting within the line and scope of his duties as a detention officer, therefore the state law claims against him can only proceed if his actions were not in compliance with the law.[9]

Plaintiff has presented evidence that Collard ignored Anderson's pain and distress, bullied him, responded slowly and brought a broken wheelchair when Anderson was lying in a pool of urine, watched Anderson's condition deteriorate without helping and yanked Anderson up by the back of his shirt saying that he had fallen down on purpose and threw him back on his bed. The Court finds that the

---

[8] "The sheriff has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law. The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible. Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law." Ala. Code § 14-6-1 ("Jailer Liability Protection Act").

[9] Plaintiff's amended complaint alleges that Collard was acting within the line and scope of his employment. *See* Doc. 25 at 113. Additionally, Collard supplied an affidavit averring that "at all times relevant to this lawsuit, [he] served as a supervisor in the Tuscaloosa County Jail." Doc. 81-5 at 2.

record, taken as a whole, could lead a reasonable jury to **conclude that Collard's** alleged actions towards Anderson violated state law—precluding summary judgment on all but one of the state law claims against him.

To prove a negligence claim under Alabama law, a plaintiff must establish duty, breach, causation, and damages. *Armstrong Business Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001). A wantonness claim requires a plaintiff to demonstrate that the defendant acted or failed to act with reckless indifference to the consequences of its acts or omissions. *Id.* at 679–80. Plaintiff has presented evidence that **Anderson's situation qualified as** an extenuating circumstance under the Directives **triggering a duty** by Collard, as shift supervisor, to call EMS. Collard failed to do so and his failure caused a delay in necessary medical treatment that could have **saved Anderson's life.** Additionally, the evidence presented regarding **Collard's demeanor, attitude and actions toward Anderson are such that a** reasonable jury could conclude they were wanton. As such, the state law negligence and wantonness claims may proceed against Collard.

Wrongful death claims in Alabama are governed by Alabama Code § 6–5–410.[10] Anderson could have commenced an action for the wrongful acts, omissions,

---

[10] "(a) A personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama . . . for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of the testator or intestate was caused, provided the testator or

or negligence if they had not caused his death. As explained above, Plaintiff has presented sufficient evidence of negligence to avoid summary judgment. Therefore, the wrongful death claim may proceed against Collard.

To prevail on an intentional infliction of emotional distress ("IIED") claim under Alabama law, Fikes is "required to present substantial evidence indicating that [Collard's] conduct [toward Anderson] (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala. 2003) (citing *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1043 (Ala. 1993)). The tort "does not recognize recovery for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities[;]" but instead "applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress." *Id.* Fikes has proffered evidence that Collard's actions were volitional. However, given the relatively short period of time between Collard's conduct and Anderson's death, demonstrating the second and third element of the IIED claim will prove to be a challenge to Fikes. To be sure, being belittled, yelled at and called a faker while suffering acute physical pain, in the aggregate could have had an effect on

intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death." Ala. Code § 6-5-410 (a) (1975).

Anderson's mental state. However, Fikes has not carried his burden in providing the Court with adequate evidence that Collard's actions qualified as extreme and beyond mere insults, or that they caused Anderson severe emotional distress. As such, summary judgment is to be granted as to the IIED claim against Collard.

## 2. Federal law claims (§1983 "Deliberate Indifference")

The United States Supreme Court has held that only deliberate indifference to serious medical needs of prisoners is actionable as a constitutional[11] violation under 42 U.S.C. § 1983. *See Estelle*, 429 U.S. at 105. To recover for deliberate indifference under § 1983, a plaintiff must establish (1) a serious medical condition that poses a substantial risk of harm if left unattended; and (2) prison officials' deliberate indifference to that condition. *See Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *see also Mann v. Taser Intern., Inc.*, 588 F.3d 1291 at 1306-07 (11th Cir. 2009) (citing *Goebert.*, 510 F.3d at 1326).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235,

---

[11] As a pre-trial detainee, Anderson's rights arise under the "due process clause of the Fourteenth Amendment rather than the Eight Amendment[']" however, his "claims are subject to the same scrutiny as if they has been brought as deliberate indifference claims under the Eighth Amendment." *Mann v. Taser Intern., Inc.*, 588 F.3d 1291 at 1306-07 (11th Cir. 2009) (citations omitted).

1243 (11th Cir. 2003) (quotation and citation omitted). The evidence, when viewed in a light most favorable to Anderson, showed a serious medical need.

Next, Plaintiff is required to show that the defendants acted with deliberate indifference to that need. **To make a showing of deliberate indifference, "a prisoner must show the prison official's: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.'"** *Bingham*, 654 F.3d at 1176 (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). The subjective knowledge requirement of this claim requires that the defendant **"must both be aware of facts from which the inference could be** drawn that a substantial risk of serious harm exists, and he must also **draw the inference."** *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (explaining that knowledge of the risk of serious harm may be established by "inference[s] from circumstantial evidence" or "from the very fact that the risk was obvious" *Id.* at 842). **"When the need for** treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."** *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citing *Ancata*, 769 F.2d at 704).

### a. Abrams and Collard

Abrams and Collard were shift supervisors on numerous occasions in the time frame during which Anderson was incarcerated. They were on duty on

February 15th—the date of his death. Their shift began at 7 a.m., and a report indicates that they observed Anderson around 9:30 a.m. By noon that day, Anderson had collapsed and lost consciousness. There are genuine disputes of fact **about what transpired during Abram and Collard's interac**tions with Anderson. **Under Plaintiff's version of the facts,** Anderson was vomiting, profusely sweating, was nauseous; had blood in his stool, acute abdominal pain and difficulty moving around—all of which are clear and classic symptoms of an ulcer, a far more serious condition than routine constipation.[12] Additionally, Anderson had hollered and continued to moan and groan in pain for days on end. While Anderson was taken to the medical clinic on multiple occasions, Plaintiff has presented evidence that the care Anderson was receiving was inadequate and he continued to exhibit obvious signs of his deteriorating condition.[13]

Plaintiff has submitted evidence that both Abrams and Collard laughed at Anderson—making fun of him and calling him a faker on numerous occasions in addition to evidence **that the seriousness of Anderson's condition would have been** obvious even to a lay person. A reasonable jury could conclude that the need to treat a man who yelled throughout the night and had been moaning, groaning,

---

[12] *See* Dr. Homer Venters Depo 18-19, 27-28, 48, 50-51. **Plaintiff also avers that Anderson's** stomach was visibility distended—but that evidence is disputed by Defendants.

[13] *See Id.* at 37-38, 51, 71-72.

sweating, asking for help, having difficulty walking, consistently vomiting and holding his stomach would have been apparent—and that the treatment he had received was "so cursory as to amount to no treatment at all." *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989). A reasonable jury could conclude that this situation constituted an extenuating circumstance under the Directives which would have required the Shift Supervisors to call EMS, and that their failure in doing was deliberate indifference to Anderson's serious medical needs.

Defendants argue that they are entitled to qualified immunity as to the deliberate indifference claims because 1) there was no evidence of any specific violation by any one defendant 2) they lack subjective knowledge of a serious medical condition and 3) non-medical personnel are entitled to rely on the expertise of medical staff.

Plaintiff's expert, Dr. Homer Venters, testified in his deposition that he believed the jail staff should have recognized that Anderson's condition was worsening, and that they had an independent obligation to go beyond the medical staff and contact EMS to attend to Anderson. (Doc. 81-14 at 51.) Abrams and Collard argue that they subjectively believed Anderson to be faking his condition. However, this shows that they were aware of Anderson's complaints of pain, and that they had ample opportunity to question the sufficiency of the treatment he was

receiving from the medical personnel. "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert*, 510 F.3d at 1326 (citing *Farmer*, 511 U.S. at 842). Though Abrams and Collard deny having subjective knowledge of Anderson's serious medical need, the Court finds that they had a duty to make an inquiry into the matter. As the Eleventh Circuit has stated in other contexts, "[a] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 902 (11th Cir. 2003). Indeed "[c]hoosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness." *Goebert*, 510 F.3d at 1328. As shift supervisors, both Abrams and Collard possessed the authority to send Anderson to the hospital and to contact EMS to render him aid. Plaintiff has presented evidence that their failure to do so and the delay that ensued likely cost Anderson his life.[14]

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." *Goebert*, 510 F.3d at 1327

---

[14] *See* Doc. 81-14 at 23-24 (" [Dr. Venters'] assessment is that systemic failures on the part of the security service and the health service contributed to this preventable death." *Id.*).

(citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). Further, "[c]ausation, of course, can be shown by personal participation in the constitutional violation." *Id.* (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)). Plaintiff has presented evidence sufficient that a reasonable jury could find both Abrams and Collard played a part in the deliberate indifference exhibited toward Anderson.

Abrams and Collard assert that they are entitled to rely on the expertise of medical staff and cite one published Eleventh Circuit opinion in support: *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034 (11th Cir. 2014).[15] In *Keith*, the Eleventh Circuit held that even assuming that a sheriff violated a plaintiff inmate's constitutional rights, the plaintiff "had failed to demonstrate that it was 'clearly established' that a sheriff has a constitutional obligation to disregard the medical expertise of the very contractors he has hired to ensure that the inmates' mental health is tended to." *Id.* at 1050. They explained that a sheriff could not be held "liable for failing to segregate a mental health inmate whom trained medical personnel [had] concluded [did] not present a risk of harm to themselves or others." *Id.* This case is distinguishable from the case at hand in that the decedent in *Keith* died at the hands

---

[15] Defendants also cite *Williams v. Limestone Cty., Ala.*, to support their reliance on the medical professionals' determination. 198 Fed. App'x 893, 897 (11th Cir. 2006) (per curiam) (unpublished) (neither county nor sheriff liable for deliberate indifference to a former county jail inmate). However, unpublished cases are not binding on this Court. *See, e.g., Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007).

of another inmate, while Anderson died of an illness that the Plaintiff has presented evidence showing would have been noticeable to a lay person. Determining the danger an inmate poses to himself and others is more nuanced than detecting an obvious medical need requiring a doctor's attention.

In sum, Abrams and Collard are not entitled to qualified immunity on the claims laid against them. If the accounts of Abram and Collard's behavior are viewed in a light most favorable to Plaintiff, there remain "genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. As such, summary judgment as to Fikes' § 1983 deliberate indifference claim against Abrams and Collard is due to be denied.

### b. Abernathy and Bailey

"[I]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citations omitted); *see also Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, for Abernathy or Bailey to be liable, there must be supervisory liability which "occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a

causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). "Under the second method, '[t]he causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" *Grey ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting *Brown*, 906 F.2d at 671). Finally, "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.*

Plaintiff has not presented sufficient evidence of a causal connection. Though he argues in his Response that Abernathy admits in his interrogatory answers that: 1) he "does not routinely work inside the jail"; 2) does not know which jail staff members or medical staff members interacted with Anderson during Anderson's incarceration; 3) cannot list or name the equipment present in the medical clinic inside the jail and; 4) has not made any subsequent changes to jail policy since the time of Anderson's death—the Court finds this to be insufficient in establishing the requisite causal connection or to establish a custom or policy that is unconstitutional. Additionally, Plaintiff provides no examples or sufficient evidence of unconstitutional policies or customs on the part of Bailey.

Nor has Plaintiff presented sufficient evidence of widespread abuse that is obvious and systemic which would put Abernathy or Bailey on notice of constitutional violations—instead Plaintiff relies on this one isolated occurrence of **Anderson's unfortunate death**. Under precedent in this Circuit, Plaintiff has failed to carry his burden of showing supervisory liability on the part of Abernathy or Bailey as such, summary judgment is due to be rendered in their favor on all claims remaining against them.[16]

## IV. MOTIONS TO STRIKE

### A. Standard

Affidavits or declarations "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "'Evidence inadmissible at trial cannot be used to avoid summary judgment.'" *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) (quoting *Broadway v. City of Montgomery, Ala.*, 530

---

[16] Because Fikes has failed to establish the deliberate indifference on the part of Abernathy and Bailey integral to the § 1983 claim against them, the Court need not address the issue of whether Sheriff Abernathy or Chief Bailey are entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (noting "[i]f no constitutional right would have been violated . . . there is no necessity for further inquiries concerning qualified immunity"), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

F.2d 657, 661 (5th Cir. 1976)).[17] Thus, the Court analyzes the evidentiary submission at issue within the motions to strike.

B. **Defendants' Motions to Strike**

1. *Declarations of Keith Brifford, Eric Ligon and Gaffery Buggs*

The law enforcement defendants move to strike certain evidence submitted by Fikes in opposition to their summary judgment, including statements of fellow inmates of Anderson, because those statements were inadmissible hearsay. To the extent that the testimony of those inmates concerned their own observations, and did not concern statements made by others, the motion to strike is due to be denied as that testimony is not hearsay.

In addition, these declarations are at least partially corroborated by the Tuscaloosa Homicide Unit summary statements of a number of inmates[18] who were housed in CB 11 during the time period of the events in question, in addition

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[18] *See e.g.* James Merrymon statement, Doc. 81-13 at 8 (stating Anderson hollered all night long on the 14th); Eric Booth statement, Doc. 81-13 at 20 (stating that Anderson moaned and hollered in pain all throughout the night, had difficulty eating and was unable to "keep anything down"; kept telling the jail staff he was sick and continually "[said] something about his thyroid problem."); Traventi Gibson statement, Doc. 81-13 at 10 (stating Anderson kept saying he "felt like his stomach was about to explode"); Ronald Russell statement, Doc. 18-13 at 19.

to the statement of a detention officer.[19] The declarations are also consistent with what Brifford, Ligon, and Buggs reported in their own statements. (*See* Doc. 81-13 at 11, 15 & 17.) Further, the evidence contained in the declarations, is, for the most part, capable of being presumed in the form of admissible evidence at trial.[20]

### 2.  *Declaration of Erica Fikes, Dr. Homer Venters and Dr. Emad Quyed*

As it was not necessary for the Court to consider the other testimony in the motion to strike in reaching its conclusions, the remaining portions of the motion are due to be denied as moot.

C. **Plaintiff's Motions** to Strike **Defendants' "facts" set forth in** paragraphs 6-7 and 9-17 of their Motion **and Defendants' Exhibit 10**

Because the Court has used its discretion in making findings of fact in the development of the record for the purposes of summary judgment by considering other pertinent portions of the record, this section **of Plaintiff's motion to strike is moot**. Though Plaintiff asserts that he has reason to believe that the nursing notes are inaccurate in significant part, he provides no further support for those parts

---

[19] Jeremiah Van Horn Declaration, Doc. 86-6 at 5, 8-9; Jeremiah Van Horn Statement, Doc. 81-13 at 34.

[20] "[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to **admissible form.**" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (citations omitted).

being struck. This portion of **Plaintiff's motion to strike is therefore due to be** denied.

IV.   Conclusion

For the reasons stated above, **Tuscaloosa's motion** for summary judgment (Doc. 78) is due to be granted, and the law enforcement **Defendants' motion for summary judgment** is due to be granted in part and denied in part. (Doc. 80.) An Order consistent with the Memorandum of Opinion will be entered contemporaneously herewith.

DONE and ORDERED on May 14, 2018.

L. Scott Coogler
United States District Judge

190685